Also, before you begin, I might also add that, with respect to these cases, both of which include an issue regarding the reduction of the voluntary departure period from 60 to 30 in a streamlined order, that issue has been argued previously in the Ninth Circuit, and there may be other cases that, for decision purposes, have priority. But nonetheless, we'd like you to spend whatever time you think appropriate on that issue as well. PASQUALE LOMBARDO Thank you. May it please the Court, my name is Pasquale Lombardo. I'm here on behalf of Petitioners Ricardo Jesus Cervantes-Cruz and Lisette Guadalupe Calleja-Leyva. I want to address the U visa issue first and then go on to the voluntary departure issue. First of all, Lisette and I also want to reserve two minutes for a rebuttal. Lisette and Ricardo both came to the United States from Mexico as very young children. They were 9 and 10 years old. They're now they've never left the United States. They're now 25 and 26. They're actually now married. They, these two young people, sought to do the right thing. They sought to legalize their status. MS. GUADALUPE CALLEJA-LEYVA Are you saying they're married to each other? PASQUALE LOMBARDO Yes. MS. GUADALUPE CALLEJA-LEYVA Oh.  MS. GUADALUPE CALLEJA-LEYVA Okay. PASQUALE LOMBARDO They came to the United States. They came with their respective families, but they're now actually married. MS. GUADALUPE CALLEJA-LEYVA And one other question. On the motion to expand the record made on behalf of Calleja-Leyva, there was nothing that was submitted to expand it with. What did you? PASQUALE LOMBARDO The only reason I filed that motion is because the court on its own expanded the record in the Cervantes-Cruz case. I assumed that the court wanted to do the same thing in the Leyva. MS. GUADALUPE CALLEJA-LEYVA So it's just a parallel type of motion. PASQUALE LOMBARDO Parallel motion. I asked the court to do the same thing in Calleja that it did in Cruz. There are no other documents. The documents are essentially MS. GUADALUPE CALLEJA-LEYVA The same documents. PASQUALE LOMBARDO Basically the same documents. MS. GUADALUPE CALLEJA-LEYVA And one of them is submitted as certification and the other hasn't. PASQUALE LOMBARDO In terms of U Visa certification? No, they both have U Visa certifications. They should be in the record in the supplemental motions that we filed for stay of removal and voluntary departure. The court should have a certification on behalf of Ricardo and one on behalf of Lissette. MS. GUADALUPE CALLEJA-LEYVA But they were in the motions. They were filed with the motions to stay, but those motions weren't necessarily before this panel. PASQUALE LOMBARDO No, but the court on its own issued an order on Friday, I believe, on its own motion construing the motions that we filed in Ricardo's case. That is the supplemental motion for stay of removal and voluntary departure as well as the supplement to supplemental motion for stay of removal and voluntary departure. Construed those motions as a request that the record be expanded and granted it. MS. GUADALUPE CALLEJA-LEYVA Well, I think the confusion was that in the, I suppose in an abundance of caution when you filed your motion with respect to Ms. Calleja-Leyva, is that you didn't actually attach the documents. You just filed the motion and then you plan to attach the additional documents once granted. Is that correct? PASQUALE LOMBARDO Well MS. GUADALUPE CALLEJA-LEYVA Or were we going to just use the same document? PASQUALE LOMBARDO Well, the documents are in front of the court. And I merely filed it as a sort of a technicality to make sure that we're on a parallel track with both cases. But basically MS. GUADALUPE CALLEJA-LEYVA All right. MR. KREBS In the second case, it's the same document, same police officer saying exactly the same thing to the same lawyer. Same issues.  MR. KREBS Same scam, basically. As I said, they sought to legalize their status. They ended up going to a notary who promised them the sky, promised them permanent residence. They ended up, in fact, on a track for deportation. They ended up applying for cancellation of removal without a qualifying relative and got 60 days of voluntary departure from an immigration judge. The notary continued to represent them, filed an appeal with the Board of Immigration Appeals, which turned around and ostensibly issued a firmness without opinion. In fact, they modified the decision. They used the magic language, but they modified the decision by reducing voluntary departure to 30 days. And then the notary filed a petition for review with this court. This fraud has caused Lisette and Ricardo a tremendous amount of stress, psychological pain, suffering. They turned around and went to the police department. They filed a complaint against this notary and made themselves available for the investigation and prosecution of this fraud. They're victims of crimes, specifically felony grand theft, among other crimes, and they qualify for U visas under the statute, under 1101A15U, a statute that was enacted back in 2000 to provide relief to victims of crimes like Lisette and Ricardo who provided information to law enforcement and made themselves available. Now, we raise this U issue before the Court for this reason. We're not asking the Court to adjudicate the merits of the U visa. What we want to make the Court aware of the fact that there are memorandums, Department of Homeland Security memorandums that are now in the record that were attached to these motions for stay of removal, et cetera, that make it clear that when Department of Homeland Security officers encounter possible victims who may be eligible for U visa, they're supposed to take steps to slow down this process, basically suspend enforcement and make sure that these people Would you just help me out on the chronology? Because when the matter was before the BIA, had the U visa, had the initial U visa authorization been enacted? I mean, I know there's no regulations yet. Yes. It was enacted in 2000, Judge. 2000. So then they go to the BIA, and at that time, did they have the certification or did that come after their BIA proceedings? That came after the BIA proceedings because at that time, they were continuing to be represented by this notary. By the same notary. Right up through actually the filing of the Petition for Review. The notary filed the Petition for Review with this Court. I didn't. I got the notary. Well, I guess the question I have then, and so I understand that obviously they couldn't have raised this. They couldn't even have raised it at the time because it didn't exist. Correct. So then we are in this kind of odd procedural posture of, and we can't stay a mandate that hasn't issued. We haven't even issued a decision, let alone a mandate. We do have authority, equitable authority to stay a voluntary departure, and I'm wondering if you could address what you think our authority would be or why you think we should invoke that authority, you know, at this stage of the proceedings. Well, thank you, Your Honor. What we're asking is that the Court take some measure, hold the matter in abeyance, continue the matter, using its jurisdiction over the voluntary departure issue, because we want to ensure that these two young people do have an opportunity to apply for U Visa regulations, under the U Visa regulations, which have yet to be promulgated. The statute was passed in 2000. It's now 2006. They've been sued, and Congress has enacted legislation in January of 2006 ordering them to issue regulations. They were supposed to be out by July, and they still are not out. Excuse me. Do the procedures and regulations provide for your securing interim relief before the actual regulations are provided, are completed? There are provisions for that, yes, Judge. So there is an alternative of seeking relief from the Court. There's an administrative process that's been set up. Well, somewhat. It's a jerry-rigged process, I believe. There are no regulations in place. I call it jerry-rigged, and I don't know what jerry-rigged means, because I've never used that term in an opinion. There is a process that's been set up that your clients can use. There's an administrative process that would allow exactly the same thing you're asking us to do by staying. So the question that's in my mind is, why should we, when they've already through the process, determine there's a way to get interim relief? Well, we've tried to make use of that process, Judge. There's been a number of back and forth between us and the Vermont Service Center, which adjudicates these applications. And there are no regulations in place, no application procedures. I understand that. It's set up precisely for that reason. Before the regulations are in place, they have an interim relief that people who could secure it. So my question is, what is the status of the record before us, the actual record before us, as to the efforts of either one of these people to secure that interim relief, and what has the response been, and how are you harmed? Well, Your Honor, we believe that we've submitted applications for relief to the Vermont Service Center several times. For interim relief? For interim relief. That's in the record. That's in the record. And we've been rejected each time, and they keep inviting us to submit evidence, and we do. Rejected? What do you mean you've been rejected? Not exactly rejected. Do we have in the record a rejection? They make – they send letters indicating we don't – they are not in a position to extend interim relief at this time. They don't actually deny it. Is that in the record? That's – the actual letter is not in the record. We've made the Court aware of that, but it's not in the record. Well, we don't have the record, then, of the response. We don't have the actual response, no. We've made the Court aware, and we've given the U visa certification, et cetera, but no. Let's just assume, for purposes of discussion, we do know that there have been correspondence with the Vermont Services Center. If you were to lose your petition on the other issue, and we didn't give you relief on the U visa, and then you were back in the U visa limbo with this lack of regulations, would you have, in your view, a right to petition for review of the absence of a decision or the denial of a decision out of the U visa situation, a separate independent path? I don't believe so, Judge, because it wouldn't be a final order from an immigration court or the BIA. The immigration court doesn't have jurisdiction over it, neither does the BIA. So the result might be – I'm just trying to figure out the practical result would be if you didn't have relief from here and you were to lose on your 60-30-day issue, then they would be in jeopardy of being deported. Exactly, Your Honor. Okay. Why don't we hear from the government, and if the government needs extra time, we'll give you an extra minute, and we'll also give you a minute for rebuttal. Thank you. May it please the Court, my name is Daniel Lonergan. I represent the respondent attorney general in this case. I'll start right away then with the last issue that was discussed, which is the U visa issue. I think that Judge Wallace hit on the question that comes to our mind, which is essentially, what is the actual detriment here to the petitioner in this case in the absence of the regulations being issued? The suggestion is that without these regulations, the petitioner doesn't exactly know what to do, what it needs to do to qualify, but more importantly, it is unable to obtain any relief in the interim, and that's just as a factual matter, that's not correct. The documents that have been introduced by the petitioner in this case, he actually sets out the interim guidance that has been issued by the Department of Homeland Security, most important of which was actually in 1980, excuse me, 2003, which was prior to the BIA's decision in 2004. But under this specific guidance, the suggestion that, well, it's kind of a limbo where no one is getting a result, counsel mentioned that there was a challenge to Homeland Security for not having issued those particular regulations, and in that lawsuit, Homeland Security had to provide some statistics up to January of 2006. Is that before us in the record? It is not, Your Honor. I don't think it's appropriate for you to be bringing outside documentation into the record, just as we did not allow the petitioner to do that. What I want to ask you about is this memorandum to Michael A. Pearson, VTVPA Policy Memorandum No. 2, which is in the record. It says, in the interim, aliens who are identified as possible victims in these categories, and it's bold, should not be removed from the United States until they have the opportunity to avail themselves of the provisions of the VTVPA. Now, how can anybody avail themselves of the provisions of the VTVPA until the regulations are issued? Because the agency has issued very specific interim guidance. It's not just a guidance on how to apply, but it also provides for deferred action, which is a particular protected status for the alien. It doesn't confer an immigration status, but what it does is it prevents the alien from being removed if it qualifies for deferred action. So do you, let's say somebody applies for the U visa. They have to go now under the interim procedures. From the time they apply, one option is, are people being granted relief? Some people? Yes, Your Honor. I was going to address that, but I apologize. I was going to say, okay, so there's those people. So they obviously don't have a complaint particularly. Then there could be people you're saying are in deferred status, and that would prevent them from being removed from the United States. Is that correct? By preferred status. Or deferred? It's actually called deferred action. Okay. Deferred action is what you want as a petitioner. So if you've applied and you've been successful in making your prima facie showing, you get deferred action. And then is there a group of people who are applied but haven't yet either been granted or deferred, and they're just sort of in a, they don't have any safe harbor, if you will, against deportation, even though they have submitted their papers for U visa? To answer your question, Your Honor, I think there's essentially three categories. Those who have successfully made their prima facie showing, they have deferred action. Those that are still being reviewed. Okay. And there are those that have reviewed that have been deemed not to have made their prima facie showing. So to answer your question, they do not have deferred action, and they can be removed. And if they have been deemed not to have made a prima facie showing, is there any right of appeal to any higher-up administrative body? Well, although I don't. Under the current interim situation. Yes, Your Honor. Although I don't represent Homeland Security, I have spoken with them. And they actually don't issue what's called a denial, where they close the file. For those who have not been successful, what they do is they issue a letter saying, you have not made your showing, but they don't close it. They leave it open so that a particular applicant can provide additional information as time passes. It may be that the particular crime that's involved, more information develops from that. So they can always augment the record, but they don't actually close it. Well, during this interim time, if they leave it open, are they also deporting those people? They are not protected. That's correct, Your Honor. So what's the point of leaving it open? Well, actually, my understanding is that if you've actually been removed from the country, you can still apply for relief under the interim guidance. And this is based what section of this says that? We have it in front of us. Where is that? I can't point to the exact page here, but I believe it's under section 212. They can get a waiver of the INA. And who do they go to get that? They would go to the Vermont Service Center. They would make their same application using the same procedures that are outlined in the interim guidance. So Congress has ordered the department to have the regulations done by last July. This July that just passed, with the reauthorization that was passed in January of this year, I think Congress was basically impatient, wondering why the Homeland Security had not issued these regulations, so it ordered them to do that by July. Regardless of what Congress was thinking, it did order them to do it by July. Is it done? It is not done. Again, I'm not here on behalf of Homeland Security, but the regulations have been drafted. They're in circulation within the agency. They do expect them to be issued soon, but they don't have a specific date. Did they tell you, like, how soon? They did not, and I don't think that they could. I mean, frankly, Your Honor, I've worked in a number of agencies, and I've worked in regulatory positions as well, and staff can complete a rulemaking. And as it goes up the chain, it may be that the actual head of the agency may decide at the last minute, let's change something. It may be that it will go out as a proposal. It may be an interim rule. I mean, that could have an effect as well. I mean, if they issued an interim rule, that would be effective right away. And so then that would be a regulation in effect, and they would continue to take comment on it. But that's just one reason why we think that holding things in abeyance. I mean, this is a very indefinite period of time. I mean, if this case is held in abeyance, waiting for these rules, particularly when there's some interim guidance in play, this could take quite a while. I mean, when you take guidance, the whole purpose of the public rulemaking is to take guidance, take comments from the public, and then they revise the regulations in response to that comment. That's why the rulemaking process works that way. So it actually can take quite a lot longer after the initial rules have been issued, either an interim stage or as a proposal. So Congress passed this act when, 2000? 2000. And it's now almost 2007. Seven years, do you think that's a reasonable time for rulemaking? Well, I mean, I'll be honest, Your Honor, that's quite a long time. I think that there were some significant structural changes after 2000. I mean, a lot of the duties that were in the Department of Justice, they created a whole new agency. And I think there was guidance that was issued in 2001, but I think being straightforward, the guidance that I think actually gives people the direction they need on how to apply wasn't issued until 2003. The practical effect, if these petitioners were to not be successful in the reduction of their voluntary departure issue, then they would be subject to having to depart the country in 30 days, is that correct, after the mandate issued here? And if they overstayed, then they would be in violation of the voluntary departure rules? Well, to answer the latter part first, yes, if they overstayed, that would be in violation. The 30 days, as I understand this Court in the decision in DESTA, once the mandate issues, let's say that's 52 days afterwards, they still have the remaining period of time. See, the 30 days started to run prior to them filing here. Correct. And I think with these two petitioners, the actual dates, the days they have left, one has 7 days and one has 9 days. So 52 plus 7, one will have 59 days and one will have 61 days, which is actually I think interesting because Congress has since they have changed the statute to limit the amount of time that the IJ, the immigration judge or the board can award for this departure, which is 60 days. In this case, both petitioners here will have that amount of time. Well, it's from the date of the mandate? Pardon me? How do they get the 52 days following the day of the issuance of the mandate? Well, I think there's 45 days. You're counting the issuance of the decision plus 45 days for a PFR, is that right? Yes, Your Honor, 45 days plus the 7. Plus the 7 for the mandate. Right. To issue after the PFR time expires. Correct. Could I ask a question? If this particular regulation is set up, we haven't seen it yet, so we don't know its nature and purpose. Can you tell us from what the record shows whether this is a whistleblower statute or whether it's a statute or regulation which allows the government to have witnesses for certain criminal conduct or is it to reward people because certain kinds of crimes have been committed against them? What's the nature of the regulation? I'd say it was two of those three things, Judge. It was, one, to help the prosecution of certain specified types of criminal behavior, certain types of trafficking and some enumerated offenses, but also in furtherance of that prosecution to provide some protection for those particular aliens who are helping with that prosecution. It would give them some additional protection during the interim. So it's both of those. And there were certain specific crimes that were targeted, as I understand it, largely protection of women against abuse. That is a — that's correct, Your Honor. They enumerate a number of crimes, but generally that's correct. And it's not, I don't believe, the type of crime, but it's not my decision. It would be the decision of Homeland Security. I understand. Not these kinds of issues. In this case, the enumerated crimes do not include the crime that's involved here. Who makes the decision that it's within the parameters of the regulation when it's not specifically one of the specific target crimes? Well, I think that first you would need to look at the particular regulations to see what the Homeland Security has said about it, how it has interpreted the statute. I think the court certainly could visit, you know, how the agency is construing that law within the confines of Chevron deference, because I think that is clearly a legal question. But I think the important thing here is a lot of emphasis here is being placed on, you know, there's really nothing here that can help the petitioner until these regulations are in place. What the interim guidance is trying to do, it's trying to say, if you can show on a prima facie the four elements that are going to be in the regulations, and it's not that their interim guidance is one thing and the regulations is another. If they're having difficulty making their prima facie showing now, they're going to have that same difficulty with the regulations issue. The problem I have with that argument is that the crimes that are listed says domestic violence, sexual assault, trafficking of aliens, and other crimes. And it's not defined, although one might assume that it would be similar type crimes. But then it also says committed against aliens while offering protection to victims of such offenses in keeping with the humanitarian interests of the United States. And conceptually, I just don't see, you know, look what happened to these people, the kind of grand theft that it was. They were victims of a notario who said he was just going to get him work authorizations and instead ended up getting them possibly deported from this country. And it's not that far of a ways for me to go to conceive that when the ultimate regulations came out, that would be another law enforcement type effort to protect aliens from being found in that situation. And we know that a number of these notarios have been prosecuted and are being prosecuted because they're defrauding very venerable people. Well, I don't know that I would disagree with Your Honor that the facts can change and get closer to these, first the enumerated crimes here, but also there is latitude for similar activities, similar types of crimes. But I think as I read the guidance, the interim guidance that's been issued, they're trying to take a liberal view now because they don't know what the regulations are going to say. So in looking at whether a particular petitioner has made their prima facie showing to qualify for deferred action, I think they're looking at it broadly now so that those people will get deferred action. And it may be that the suggestion at least is that the regulations may more specifically define what you need to do. But in the interim, they're trying to be over-inclusive instead of under-inclusive. Thank you. Unless there's further questions. Thank you. I appreciate it.  You have one minute for rebuttal, Mr. Lombardo. Thank you. I'll just pick up on the last point that was made by government counsel, which is that the government is being over rather than under-inclusive. I believe that's speculation, and that is one of the issues here. The statute not only lists specific crimes, but it talks about similar crimes. And granted, many of the crimes involve domestic violence, kidnapping, et cetera. But it also mentions extortion. It mentions perjury. It mentions obstruction of justice. They're not all crimes involving domestic violence, et cetera, and sexual assault. Secondly, one of the points is we don't have any regulations in place to talk about what are similar crimes. One of the guidances, all the guidances are very generous. One of them, August 30, 2001, which is in the record, reads as follows. In the absence of governing regulations, service personnel should ensure broad interpretation of the guidance. To ensure an alien is not removed from the United States if it appears that they fit into one of these victim categories. Thank you. I think we have your points in mind. Thank both counsel for your arguments this morning. The cases of Cervantes-Cruz and Calleja-Lleva are submitted. Our next case for argument this morning is Heinrichs v. Valley View Development.
judges: Wallace, McKeown, Wardlaw